# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DANIEL FELDMAN, JONATHAN )
WYATT GRUBER, JOHN CHARLES )
POPE REVOCABLE TRUST and )
TIERNEY FAMILY INVESTORS, )
LLC, )
                        )
         Plaintiffs, )
                        )
         v. )   C.A. No. 2020-0314-PAF
                        )
AS ROMA SPV GP, LLC, JAMES J. )
PALLOTTA, RICHARD A. )
D'AMORE, THE RUANE )
IRREVOCABLE GST TRUST OF )
2007, SHAMROCK HOLDINGS OF )
CALIFORNIA, INC. and RAPTOR )
HOLDCO, LLC, )
                        )
         Defendants. )

## MEMORANDUM OPINION

Date Submitted: April 13, 2021
Date Decided: July 22, 2021

Peter B. Ladig, Brett M. McCartney, Sarah T. Andrade, BAYARD, P.A., Wilmington, Delaware; Rishi Bhandari, MANDEL BHANDARI LLP, New York, New York; *Attorneys for Plaintiffs Daniel Feldman, Jonathan Wyatt Gruber, John Charles Pope Revocable Trust, and Tierney Family Investors, LLC.*

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, DLA PIPER LLP (US), Wilmington, Delaware; *Attorneys for Defendants AS Roma SPV GP, LLC, James J. Pallotta, Richard A. D'Amore, The Ruane Irrevocable GST Trust of 2007, Shamrock Holdings of California, Inc., and Raptor Holdco, LLC.*

**FIORAVANTI, Vice Chancellor**

Associazione Sportiva Roma S.p.A. ("AS Roma" or the "Club") is a storied Italian professional soccer club founded in 1927. Based in Rome, the team competes in Italy's highest and most prestigious league, Serie A. Nicknamed the "Giallorossi" for its colors of yellow and red, AS Roma has won the league title three times, earning the right to wear the coveted scudetto (or little shield) bearing the colors of the Italian flag on the team's jersey the following year.[1]

A decade ago, a group of American investors acquired control of the Club. They held that controlling interest through a Delaware limited liability company. Plaintiffs are minority members of the company. In 2019, the control group sought to sell the company's interest in the Club. When the COVID-19 pandemic swept through Italy in early 2020, the sale process stalled, and controlling members of the company sought additional investment from its members to sustain the Club. Plaintiffs declined to make any additional investment and, instead, have alleged an assortment of claims challenging the control group's actions. Defendants have moved to dismiss those claims. This opinion resolves that motion.

---

[1] *See* John Foot, CALCIO: A HISTORY OF ITALIAN FOOTBALL 17 (2d ed. 2007); *see also id.* 118–21 (describing the origins and history of the Club).

## I. FACTUAL BACKGROUND[2]

### A. The Parties

AS Roma is publicly traded on the Borsa Italiana, the Italian stock market. In the summer of 2011, a group led by Thomas DiBenedetto, including Defendants James J. Pallotta and Richard A. D'Amore, and non-party Michael Ruane, who controls Defendant The Ruane Irrevocable GST Trust of 2007 (the "Ruane Trust"), acquired a controlling interest in the team.[3] DiBenedetto's group became the first foreign owner of an Italian top league football club.[4] Pallotta later became the team's president.[5]

The American group held its interest in the Club through non-party AS Roma SPV, LLC (the "Company"), a Delaware limited liability company. Am. Compl. ¶ 1. Plaintiffs are all members of the Company, each owning a minority equity interest. *Id.* ¶¶ 29–32.

---

[2] The facts are drawn from the allegations in the First Amended Verified Complaint (Dkt. 8, the "Amended Complaint" or "Am. Compl."), documents integral thereto, and facts subject to judicial notice. Citations of "Ex. 1," "Ex. 2," "Ex. 3," and "Ex. 4" refer to exhibits submitted with Defendants' briefs (Dkts. 18, 23). Unless otherwise indicated, the facts are those existing at the time of the filing of the Amended Complaint.

[3] *See* Associated Press, *Roma's New Owner Reveals Broad Plans*, ESPN (Nov. 18, 2011, 1:50 PM), www.espn.com/sports/soccer/news/_/id/7250811/as-roma-new-us-owner-thomas-dibenedetto-reveals-ambitious-plans.

[4] *See* Giulia Segreti, *US Investor Buys Majority Stake in AS Roma*, FINANCIAL TIMES (August 18, 2011), https://www.ft.com/content/1cc2940a-c9b3-11e0-b88b-00144feabdc0.

[5] *See History*, OFFICIAL AS ROMA WEBSITE, https://www.asroma.com/en/club/history (last visited July 21, 2021).

Defendant AS Roma SPV GP, LLC ("AS Roma GP"), a Delaware limited liability company, is the Company's Managing Member. *Id.* ¶ 33. AS Roma GP's Managing Member is Defendant Raptor Holdco GP, LLC ("Raptor"), which is also a Delaware limited liability company. *Id.* ¶ 34. Pallotta exercises control over Raptor, and he owns, directly or indirectly, a majority of the units in the Company. *Id.* ¶¶ 2, 35.

To help sustain the Company in recent years, some of its members provided loans (the "Existing Loans"). As of the filing of the Complaint, the balance on the Existing Loans was approximately €147 million, including interest. *Id.* ¶¶ 58, 62. Of the Existing Loans, Pallotta held Company notes with an outstanding principal balance of not less than €44 million. *Id*. ¶ 59. D'Amore held Company notes with an outstanding principal balance of not less than €3 million, and The Ruane Trust held Company notes with an outstanding principal balance of not less than €13 million. *Id*. ¶¶ 60–61. The Existing Loans do not give the note holders any additional rights to equity of the Company. *Id*. ¶ 63.

The Company is governed by a Fifth Amended and Restated Limited Liability Company Agreement (the "LLC Agreement").[6] Management of the Company is vested in the Managing Member, although certain actions require approval of a five-

---

[6] The LLC Agreement is Exhibit A to the Amended Complaint.

member Investor Committee. The members of the Investor Committee are Pallotta, Ruane, D'Amore, DiBenedetto, and a designee of ASR SOF-IX Investment, L.L.C.[7]

### B. Pallotta Looks for an Exit.

By October 2019, the Company had engaged Goldman Sachs, Inc. ("Goldman Sachs") as a financial advisor to seek out a strategic transaction to sell the Company's controlling interest in AS Roma and provide an exit for the Company's investors. Am. Compl. ¶ 65. Goldman Sachs and the Investor Committee identified more than 40 potential bidders, ultimately resulting in a prospective purchaser being granted exclusivity. *Id.* ¶ 66; Ex. 1 at 1. Following extensive due diligence that resulted in a letter of intent, the Company and the exclusive bidder engaged in negotiations on a definitive transaction beginning in December 2019. Am. Compl. ¶ 66; Ex. 1 at 1. Following Italian media reports, AS Roma confirmed in late December 2019 that it was in negotiations with American-based The Friedkin Group ("TFG"), led by its CEO, Daniel Friedkin, concerning a potential transaction.[8] The Company stated that "any potential transaction with The Friedkin Group remains

---

[7] *Id.* § 6.6. The Complaint refers to Pallotta, D'Amore, and the Ruane Trust as the "Investor Committee Defendants," even though it is non-party Ruane, and not the Ruane Trust, that serves on the Investor Committee. Am. Compl. ¶¶ 37, 40. Plaintiffs refer to the same three defendants as the "Lender Defendants." *Id.* ¶ 39. This opinion uses the same defined terms for those defendants as does the Amended Complaint.

[8] *See Official AS Roma Statement: 29 December 2019*, OFFICIAL AS ROMA WEBSITE (Dec. 29, 2019)*,* https://www.asroma.com/en/news/2019/12/official-as-roma-statement-29-december-2019.

5

subject to a successful completion of a legal due diligence upon the AS Roma Group."[9]

### C. The COVID-19 Pandemic Strikes Italy and the Company Seeks to Raise Capital.

Italy became the epicenter of the COVID-19 pandemic in Europe starting in mid-February 2020. Ex. 1 at 2. The Italian government eventually suspended all Italian sporting events, including Serie A matches. *Id.* The tender process for broadcasting rights for the Serie A league for the 2021–24 seasons was delayed. *Id.* AS Roma was forced to close its offices. *Id.* AS Roma also implemented a series of cost cutting and deferral initiatives, including an agreement with certain of its players and technical staff to defer salary and the election of management to renounce a portion of their salary. Ex. 2 at 1.

On March 23, 2020, the Investor Committee sent a letter to members of the Company (the "March 23 Letter"), providing an update on the status of strategic discussions and detailing the Company's current financial situation. Compl. ¶ 68; Ex. 1. The March 23 Letter noted that the "spread of COVID-19 has created significant uncertainty for Serie A and its member clubs, including [AS Roma] . . . and has had a chilling effect on global M&A and capital markets." *Id.* at 1. The March 23 Letter stated: "While the prospective purchaser has continued to express

_____

[9] *Id.*

interest in acquiring the Club and we remain open to assessing any good faith proposals, the transaction resulting from the auction process stalled this month and the most recent communications have involved substantial modifications to the deal terms (both economic and structural) which have not yet proven to be actionable." *Id.*

With the near-term prospects of a strategic transaction uncertain, the March 23 Letter described an immediate need for additional capital on top of the Existing Loans. *Id.* at 3. The March 23 Letter noted that the Company had previously anticipated that AS Roma would be able to address its near-term financial needs through player trading activity in the transfer market. But player injuries, the outbreak of COVID-19, and the uncertain prospects of a near-term strategic transaction created a need for additional capital to support AS Roma's current financial obligations, including minimum capital requirements under the Italian Civil Code. *Id.*

To meet those needs, the Investor Committee proposed a financing (the "Preferred Equity Offering"), available to all members, which would raise €50 million via the issuance of new Class C membership units. The Class C units would have priority over the Company's existing Class A and Class B units and would have a 1.5x liquidation preference. Am. Compl. ¶¶ 69–70. In addition, the Company sought to recapitalize €147 million in Existing Loans by exchanging them for Class

7

C units on the same terms (the "Recapitalization"). As part of the proposed Recapitalization, the Company offered members the opportunity to participate in all member loans (to the extent members previously declined to participate) on a pro rata basis. As a result, each member had the right to participate on a pro rata basis in both the Preferred Equity Offering and the Recapitalization with their pro rata participation right determined on the aggregate €197 million value of the combined issuances. Any member that so participated would not be diluted and would receive pari passu Class C units. Ex. 2 at 3.

The March 23 Letter attached three exhibits: a term sheet, an election notice, and an amendment (the "Amendment") to the LLC Agreement. Ex. 1. Two days later, on March 25, 2020, the Company hosted a conference call for its members in which Plaintiffs participated. Am. Compl. ¶ 73. During the call, Pallotta explained that, given the circumstances, if minority members wanted to preserve any interest in the Company, they should participate in the Preferred Equity Offering. *Id.* ¶ 75. In anticipation of the Preferred Equity Offering and Recapitalization, the Company effected the Amendment on March 18, 2020. *Id.* ¶ 7. Section 1.d of the Amendment provides, among other things:

> At the Initial Closing or a Subsequent Closing, as applicable, pursuant to the terms of those certain subscription agreements entered into between the Company, on the one hand, and the applicable Class C Member, on the other hand (collectively, the "Class C Subscription Agreements"), each Class C Member (x) has made a Capital Contribution to the Company, and (y) the Company has issued to such

8

Class C Member the number of Class C Units, in each case, as set forth in such Class C Member's Class C Subscription Agreement, at a price of €487.025 per Class C Unit (the "Original Class C Unit Price").

Ex. 1 (Amendment). As described in the Amendment, the Capital Contribution made by a member in exchange for Class C units could consist of cash and/or cancellation of Existing Loans. Following issuance, the Class C units could be converted at the option of the holder into Class A units. Am. Compl. ¶ 8. Under Section 1.a of the Amendment, "'Initial Closing' means on or about March 25, 2020." Ex. 1 (Amendment).

Even with the 1.5x liquidation preference and the risk of holding a junior equity security in the Company, "the Company did not achieve sufficient participation . . . to meet [AS Roma's] capital requirements [and] the Investor Committee determined not to proceed." Ex. 2 at 3. As a result, the Preferred Equity Offering and Recapitalization were "abandoned and were 'not proceeding as contemplated.'" Am. Compl. ¶ 11; Ex. 2 at 3. No subscription agreements were ever entered into and no Class C units were ever issued. Am. Compl. ¶ 85. Nonetheless, Plaintiffs allege that "[t]he fact that the Amendment allows [Existing] Loans to be converted to Class C shares, plus the Class C shares' conversion right, together with the low initial price for Class C shares, immediately diluted and impaired the value of existing Class A shares." Am. Compl. ¶ 9.

9

**D. The Company Proposes the 2020 Member Loans**

After abandoning the Preferred Equity Offering and Recapitalization, the Company sought alternative financing. In a May 14, 2020 update to investors (the "May 14 Letter"), AS Roma GP and the Investor Committee proposed a new financing transaction. Am. Compl. ¶ 15. The new transaction called for a €30 million secured bridge loan from lenders led by Goldman Sachs and €25 million in new member loans (the "2020 Member Loans"). Ex. 2 at 3–4. The 2020 Member Loans would accrue interest at 9% and, in the event of a sale of the Company, would receive a premium payment equal to 50% of the outstanding principal amount. Am. Compl. ¶ 87. The 2020 Member Loans would be senior to the Company's outstanding units and the Existing Loans. *Id.* The outstanding principal and unpaid interest on the 2020 Member Loans would be due and payable by the Company on February 1, 2021. *Id.* ¶ 20. The Investor Committee offered all Class A members their pro rata opportunity to participate in the 2020 Member Loans. Ex. 2 at 4.

The May 14 Letter also provided members with a further update on the sale process. The May 14 Letter stated: "At the current time, there is no actionable proposal with any prospective purchasers of the Club." *Id.* at 2. It provided members with further detail as to the status of a potential sale, including that the Company was informed that the prospective purchaser is "currently unable to pursue a transaction as originally contemplated. While they remain interested, no formal

10

proposal has been presented." *Id.* The May 14 Letter also disclosed that the Investor Committee was seeking other competitive proposals "and has commenced a process to engage a second investment banking firm for strategic guidance." *Id.* at 2–3; *see also* Am. Compl. ¶ 88.

On June 22, the 2020 Member Loans closed with approximately 80% of the existing membership interests participating. Defs.' Opening Br. 15.

### E. The Litigation

Plaintiffs filed their original complaint on April 27, 2020, which was focused primarily on the Preferred Equity Offering and Recapitalization. Once the Company abandoned those proposed transactions, Plaintiffs filed a six-count Amended Complaint on May 29, 2020. The Amended Complaint takes aim at the 2020 Member Loans and the Amendment. Count I alleges that AS Roma GP breached the LLC Agreement by approving the Amendment and failing to disclose all material information to the Class A unitholders in connection with the 2020 Member Loans. Count II alleges AS Roma GP breached its fiduciary duties to the Company and the non-managing members. Count III alleges that Pallotta, D'Amore, and the Ruane Trust breached their fiduciary duties as members of the Investor Committee. Count IV alleges that Raptor aided and abetted AS Roma GP's fiduciary duties. Count V

11

alleges that the Lender Defendants (Pallotta, D'Amore, and the Ruane Trust) were unjustly enriched by the rights granted to them under the Amendment.[10]

Defendants have moved to dismiss the Amended Complaint for failure to plead demand futility under Court of Chancery Rule 23.1, failure to state a claim under Rule 12(b)(6), and for lack of subject matter jurisdiction under Rule 12(b)(1).

## F.    The Company Sells Its Controlling Interest in AS Roma to TFG.

Defendants filed their opening brief in support of their motion to dismiss on August 5, 2020. On that same day, the Company announced that it had entered into a definitive agreement with TFG to acquire the Company's controlling interest in AS Roma. In a letter sent to the Class A members announcing the deal, AS Roma GP and the Investor Committee disclosed that the enterprise value of the transaction was €591 million and was "structured in a manner to achieve a swift closing with minimal post-closing liabilities for the Company." Ex. 3 at 1. The letter also provided a summary of the due diligence process, stating that "it was not until the Club resumed play in early June that TFG re-engaged" and noting that TFG's re-engagement "coincided with public reports that other third parties were engaged in due diligence on the Club." *Id.* at 2.

---

[10] Plaintiffs voluntarily dismissed Defendant Shamrock Holdings of California, Inc. on July 2, 2020. Dkt. 14.

In a follow-up letter to Class A members on August 24, 2020, AS Roma GP and the Investor Committee announced that the transaction had closed on August 17, 2020. Ex. 4 at 1. The letter explained that TFG paid €199 million for the Company's controlling interest in the Club. That amount, along with €34 million cash on hand, would enable the Company to repay the Goldman Sachs bridge loan, transaction expenses, the 2020 Member Loans, and nearly all of the Existing Loans. The letter further stated that €10 million was being held in reserve, and if the Company could implement an efficient winding-up process, the Company may be able to pay the balance of the Existing Loans and effect a small distribution to Class A members. *Id.* at 2.[11]

The parties thereafter completed briefing on the motion, and the court held oral argument on April 13, 2021.

## II. ANALYSIS

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate

---

[11] Although the transaction was not mentioned in the opening brief, Defendants point to the transaction in their reply brief as a further basis to dismiss Plaintiffs' claims on grounds of mootness.

13

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted). The pleading standards are minimal. *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). Nevertheless, "a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). The court need not accept as true allegations that are contradicted by documents upon which the complaint is based. *Peter Schoenfeld Asset Mgmt. LLC v. Shaw*, 2003 WL 21649926, at *2 (Del. Ch. July 10, 2003). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

"On a motion to dismiss under Rule 12(b)(1), the plaintiff 'bear[s] the burden of establishing subject matter jurisdiction,' and 'a court may consider documents outside the complaint.'" *CelestialRX Invs., LLC v. Krivulka*, 2019 WL 1396764, at *14 (Del. Ch. Mar. 27, 2019) (quoting *HBMA Hldgs., LLC v. LSF9 Stardust Hldgs. LLC*, 2017 WL 6209594, at *3 (Del. Ch. Dec. 8, 2017)); *see also NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 435 n.43 (Del. Ch. 2007)

14

("Because the requirement of an actual controversy goes directly to the court's subject matter jurisdiction over an action, a motion to dismiss based on [mootness] grounds is properly viewed in the context of Court of Chancery Rule 12(b)(1), and the court may consider documents and materials extrinsic to the complaint.").

Plaintiffs' claims in the Amended Complaint are confined to two discrete issues: (1) the disclosures made to Class A unitholders in connection with the 2020 Member Loans; and (2) the Amendment, which is the remnant of the abandoned Preferred Equity Offering and Recapitalization. The parties dispute whether Plaintiffs' claims are direct or derivative. They also dispute the extent to which any defendant, other than AS Roma GP, owes fiduciary duties to Plaintiffs and the other Class A members. I need not resolve those issues to decide the pending motion, because the Amended Complaint does not state a claim, regardless of how the claims are characterized and to whom they are directed.

### A. The Amended Complaint Does Not State a Disclosure Claim.

The Delaware Limited Liability Company Act provides that an LLC Agreement can modify or eliminate common law fiduciary duties. 6 *Del. C.* § 18-1101(c) ("To the extent that . . . a member or manager . . . has duties (including fiduciary duties) . . . , the member's or manager's . . . duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement."). An LLC agreement may impose fiduciary duties as a matter of contract. *See Gatz*

15

*Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1213 (Del. 2012) (concluding LLC agreement "contractually adopt[ed] the fiduciary duty standard of entire fairness"). The LLC Agreement provides that AS Roma GP "shall have the same fiduciary duty to the Company and its Non-Managing Members as does a director of a Delaware corporation to such corporation and its shareholders." LLC Agreement § 6.2(d). Accordingly, the court applies the same standard to Plaintiffs' disclosure claim as it would apply to a disclosure claim asserted against a director of a Delaware corporation.

In a request for stockholder action, directors are under a duty to disclose fully and fairly all material facts within their control bearing on the request. *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989). A stockholder states a claim for breach of this duty if it can allege facts to support "a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotations omitted). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus.*, 426 U.S. at 449). For purposes of resolving the pending motion, I assume, without deciding, that the proposed 2020 Member Loans was a request for member action to which fiduciary duties attached.[12]

The Amended Complaint alleges that AS Roma GP breached its fiduciary duties by failing to fully and fairly disclose all material information within its control when asking Class A members to participate in the 2020 Member Loans. First, the Amended Complaint makes the naked assertion that "the financial statements provided by the Defendants are incomplete and misleading." Am. Compl. ¶ 89. The Amended Complaint identifies no financial information that is lacking and contains no well-pleaded facts to support this conclusory allegation. "[I]t is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory." *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 (Del. 1997). "Conclusory allegations will not be accepted as true without specific supporting factual allegations." *In re Santa Fe Pac. Corp. S'holder Litig.*,

---

[12] Defendants argue that there was no duty of disclosure in connection with the 2020 Member Loans. Defendants rely on *Dohmen v. Goodman*, 234 A.3d 1161 (Del. 2020), where the Delaware Supreme Court, responding to a certified question, held that a general partner's request to a single limited partner for a one-time capital contribution did not give rise to a fiduciary duty of disclosure. *Id.* at 1164–65. Plaintiffs argue that *Dohmen* is inapposite because the disclosures concerning the 2020 Member Loans were presented to all Class A members, who were asked to participate on a pro rata basis. Pls.' Ans. Br. 25–26. I need not resolve that dispute in order to decide the pending motion.

17

669 A.2d 59, 65–66 (Del. 1995); *see In re Boston Celtics Ltd. Partnership S'holders Litig.*, 1999 WL 641902, at *3 (Del. Ch. Aug. 6, 1999) ("Mere conclusory allegations, however, will not be accepted as true."); *see also, e.g., Steinman v. Levine*, 2002 WL 31761252, at *13 n.67 (Del. Ch. Nov. 27, 2002) (allegation that financial statements did not accurately reflect the deteriorating financial condition of the company was conclusory in that it failed to point to a single flaw in the financial statements). At oral argument, Plaintiffs abandoned their disclosure claim based upon the Company's financial statements, conceding that "[those are] not the particular disclosures that we're challenging here." Oral Arg. Tr. 42. The conclusory allegation of incomplete and misleading financial statements does not state a disclosure claim, and it is dismissed.

Second, Plaintiffs allege that AS Roma GP failed to disclose "information concerning the prospective sale of the club." Am. Compl. ¶ 122. The terms of the 2020 Member Loans provided for a 1.5x payment if a sale of the Club occurred by February 1, 2021. Therefore, Plaintiffs argue, "one critical piece of information that any investor in the 2020 Member Loan needs to know is how likely it is that a liquidation transaction will occur prior to February 1, 2021 because if such a transaction occurs, there will be a 50% liquidation preference on any money invested as part of the May 14, 2020 round of financing." *Id.* ¶ 21.

18

The May 14 Letter provided the following disclosure concerning the status of the sale process:

> At the current time, there is no actionable proposal with any prospective purchasers of the Club. As you may expect, the current worldwide COVID-19 situation has created significant uncertainty and had a chilling effect on global M&A and capital markets.
>
> The prospective purchaser with whom the Company entered into an exclusivity arrangement has indicated that the COVID-19 situation has materially impaired its other lines of business. As a result, we have been advised that they are currently unable to pursue a transaction as originally contemplated. While they remain interested, they have indicated that any prospective transaction would require a substantial reduction in enterprise value and would require that the Class A Members retain a minority equity position in the Club for an extended period of time. Notwithstanding these indications, no formal proposal has been presented.
>
> The Investor Committee continues to seek out other competitive proposals, and has commenced a process to engage a second investment banking firm for strategic guidance.[13]

Delaware law does not require a blow-by-blow description of fluid sale negotiations. *See Matador Cap. Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) ("The application of [the reasonable investor] standard does not require a blow-by-blow description of events leading up to the proposed transaction."). Plaintiffs essentially complain that they were entitled to a prediction of whether a sale would occur before February 1, 2021. I am not persuaded that AS

---

[13] Ex. 2 at 2–3.

Roma GP was required to be an oddsmaker for Plaintiffs concerning a potential sale transaction occurring by a specific date. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994) ("Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information."); *In re Bioclinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *10 (Del. Ch. Oct. 16, 2013) ("The Plaintiffs have the burden of bringing claims based on actual facts and reasonable inferences, rather than speculation."). The Amended Complaint does not allege that AS Roma GP's May 14, 2020 disclosure about the status of the sale process was false or materially misleading. Nor does the Amended Complaint identify any specific information concerning the status of the sale process at the time of the May 14 Letter that AS Roma GP withheld from the Class A unitholders.[14] At best, "[t]his is simply a 'tell me more' request that, unlike a viable disclosure claim, fails to identify how the [disclosure] is misleading or incomplete." *Dent v. Ramtron Int'l*

---

[14] In their answering brief, Plaintiffs argue that "Defendants were aware of a potential sale of the Company to the Friedkin Group but chose not to reveal information about the status of that sale when presenting the 2020 Member Loans opportunity to minority members." Pls.' Ans. Br. 28. Plaintiffs cannot amend their complaint through briefing. *See Sparton Corp. v. O'Neil*, 2017 WL 3421076, at *5 n.36 (Del. Ch. Aug. 9, 2017) (observing that a plaintiff "is bound to the factual allegations contained in its complaint [and] cannot supplement the complaint through its brief."). In any event, the May 14 Letter disclosed that the "prospective purchaser with whom the Company entered into an exclusivity arrangement [i.e., TFG] . . . remain[s] interested . . . ." Ex. 2 at 2. Thus, the May 14 Letter was not misleading.

20

*Corp.*, 2014 WL 2931180, at \*13 (Del. Ch. June 30, 2014). Accordingly, the Amended Complaint does not state a breach of fiduciary duty claim concerning the disclosures about the status of sale negotiations in connection with the 2020 Member Loans.

**B.** **The Amended Complaint's Claims Concerning the Abandoned Preferred Equity Offering, Recapitalization, and the Amendment Fail.**

As proposed on March 23, 2020, AS Roma GP invited all Class A members, including Plaintiffs, to participate in (1) the Preferred Equity Offering to purchase Class C units, which was designed to raise an additional €50 million, and (2) the Recapitalization, which allowed the holders of €147 million in existing Company debt to convert that debt into Class C units. The Company also offered all Class A members the opportunity to participate pro rata in the Preferred Equity Offering and Recapitalization to the extent that any Class A member previously declined to participate in the prior loan offerings. *See* Ex. 1 (Summary of Terms); Ex. 2 at 3.

The Amendment created the Class C units. Under the Amendment, proceeds from a Liquidity Event would first be paid to Class C members until each Class C unitholder has received an amount equal to the greater of (a) 1.5 times its purchase price per unit or (b) such amount per Class C unit as would have been payable had all Class C units converted into Class A units immediately prior to the Liquidity

21

Event. The Amendment also provided that the Class C units were optionally convertible into Class A units.

In a May 14, 2020 letter to its Class A members, AS Roma GP and the Investor Committee announced that they had "determined not to proceed with the Preferred Equity Offering or the Recapitalization." Ex. 2 at 3. Instead, they determined to address the Company's financial situation with the 2020 Member Loans. When AS Roma GP and the Investor Committee abandoned the Preferred Equity Offering and Recapitalization, however, they did not further amend the LLC Agreement to rescind the Amendment.

Plaintiffs continue to pursue claims and assert harms as to the continued existence of the Amendment. As alleged in the Amended Complaint, "[t]he fact that the Amendment allows Member Loans to be converted to Class C shares, plus the Class C shares' conversion right, together with the low initial price for Class C shares, immediately diluted and impaired the value of existing Class A shares." Am. Compl. ¶ 9; *see also id.* ¶ 110 ("AS Roma SPV GP, LLC breached its obligations under the contract . . . by (i) approving the Amendment, which diluted and impaired the value of Class A shares."). Plaintiffs' claims must be dismissed for failure to state a claim and, in any event, they fail to present a justiciable controversy.

22

### 1. The Amended Complaint Fails to State a Claim that Plaintiffs Have Been Harmed by the Issuance of Class C Units.

To the extent that Plaintiffs allege that they have been harmed by the issuance of Class C units, Plaintiffs fail to state a claim because this allegation is negated by other allegations in the Amended Complaint.

The Complaint acknowledges that the proposed Preferred Equity Offering and Recapitalization were abandoned. Am. Compl. ¶¶ 10–15. Defendants repeatedly informed Plaintiffs of this fact. *Id.* ¶¶ 81, 85. The Initial Closing never occurred, and no Class C units were ever issued.[15] Plaintiffs do not allege otherwise. There are no well-pleaded allegations that the Preferred Equity Offering or the Recapitalization—which included the ability of holders of Existing Loans to convert the debt into Class C units—ever came to pass. At bottom, Plaintiffs dispute the bona fides of AS Roma GP's and the Investor Committee's representations that they had abandoned the Preferred Equity Offering and Recapitalization. Plaintiffs' assertion of harm arising from the issuance of Class C units is not reasonably conceivable and contradicted by the Amended Complaint and the documents integral thereto, such as the May 14 Letter.

---

[15] An August 24, 2020 letter to Class A members listed the use of proceeds from the TFG transaction. There are no Class C units identified. Instead, it states that €38 million in proceeds would be used to repay the 2020 Member Loans and €144 million would be used as partial repayment of the Existing Loans. Ex. 4 at 1.

## 2. The Amended Complaint Fails to State a Claim that Plaintiffs Have Been Harmed by a Possibility of Conversion.

Plaintiffs allege that, because the Company did not rescind the Amendment, Plaintiffs continue to "[face] the Amendment to the [LLC] Agreement concerning Class C shares that stands to wrongfully dilute their Class A interests in the Company." Am. Compl. ¶ 90. Plaintiffs "seek damages to the extent the value of their Class A shares has already been impaired by . . . (iii) a modification to the [LLC] Agreement allowing the conversion of [Existing] Loans to Class C shares, as set forth in the Amendment." Am. Compl. ¶ 25; *id.* ¶ 94(b) (alleging impairment due to "the possibility that [Existing] Loans could be converted to Class C shares at any time"). Plaintiffs fail to state a claim because these allegations are negated by the terms of the Amendment and other allegations in the Amended Complaint.

The Amendment provided that conversion of the Existing Loans of approximately €147 million into Class C units—the Recapitalization—would occur at the Initial Closing, and that the issuance of the remaining Class C units for €50 million—the Preferred Equity Offering—would occur at the Initial Closing or a Subsequent Closing. The "Initial Closing" was defined to mean "on or about March 25, 2020." Ex. 1 (Amendment) at 2. A Subsequent Closing was defined as any purchase or sale of Class C units consummated after the Initial Closing. Ex. 1 (Amendment) at 1. The Investor Committee informed the Company's investors that Subsequent Closings would occur before December 31, 2020. Ex. 1 (Summary of

24

Terms). Thus, the Amendment unambiguously provided that the conversion of the Existing Loans into Class C units would occur on or around March 25, 2020 and that the purchase of the remaining Class C units would occur at either the Initial Closing or a Subsequent Closing. The Amendment did not provide for the conversion of the Existing Loans at a Subsequent Closing.

The Initial Closing never happened. Plaintiffs admit that "days after Plaintiffs filed their initial complaint in this action [on April 27, 2020], they were informed that the capital raise and Member Loan conversion described in the March 23 letter had been abandoned and were 'not proceeding as contemplated.'" Am. Compl. ¶ 11. Plaintiffs allege that counsel for the Investor Committee sent a letter to Plaintiffs, informing them that "the Investor Committee had 'determined not to proceed with the Preferred Offering' described in the March 23 letter. A follow-up letter sent the next day stated that if the Investor Committee 'pursues financing that requires the participation and/or approval of Class A Members, a formal communication with *new* and *different terms* will be sent to them . . . ." *Id*. ¶ 81 (emphasis in original). Apparently unsatisfied with those representations, Plaintiffs asked Defendants "[o]n numerous occasions" since April 27, 2020 "for information sufficient to determine when and why the improper, self-dealing transaction had been abandoned and to provide an assurance that no such transaction would be undertaken." *Id*. ¶ 12. Plaintiffs complain that "Defendants failed to substantiate [their] claim that the

[Existing] Loan conversion had been abandoned"; instead, "Defendants stated that they had not rescinded the [A]mendment." *Id*. ¶ 13.

In addition to Defendants' direct representations to Plaintiffs that the March 23 transaction had been abandoned, AS Roma GP and the Investor Committee sent the May 14 Letter to all Class A unitholders, which again stated that "the Investor Committee determined not to proceed with the Preferred Equity Offering or the Recapitalization." Ex. 2 at 3. Instead, the Investor Committee decided to pursue "other financing alternatives, which are discussed in more detail below." *Id*. The other alternatives described in the May 14 Letter are a bridge loan facility of up to €30 million and the 2020 Member Loans of up to €25 million. *Id*. at 3–4. The May 14 Letter also mentioned this litigation and Plaintiffs' claims. The May 14 Letter stated: "The Company promptly informed [Plaintiffs] and their legal counsel that the Investor Committee had already determined not to proceed with the Preferred Equity Offering and the Recapitalization given the insufficient participation and was actively seeking other financing alternatives." *Id*. at 5.

The Amended Complaint acknowledges that the Recapitalization did not occur and that Defendants informed Plaintiffs and all Class A unitholders that the Recapitalization would not proceed. The Amendment itself demonstrates that the Recapitalization cannot occur. Once the Preferred Equity Offering and the Recapitalization were abandoned, there was no ability for the holders of Existing

26

Loans to convert their debt into Class C units. That conversion could only have occurred upon AS Roma GP's acceptance of the underlying subscription agreements and the holding of the Initial Closing as provided for in the Amendment. Neither of those events occurred, and Plaintiffs do not identify any language in the Amendment that enabled the holders of Existing Loans qua debt holders unilaterally to convert their debt into Class C units. Because the Amendment only provided for conversion of Existing Loans into Class C units at the Initial Closing "on or about March 25, 2020," the threat for dilution by conversion never came to pass. Furthermore, because there was no Initial Closing, there was no Subsequent Closing, and the opportunity for Defendants to issue Class C units at an Initial Closing or a Subsequent Closing has likewise passed. Plaintiffs' allegation that the Amendment impaired and continues to impair the value of the Class A units fails to state a claim.[16]

### 3. Plaintiffs' Claims Fail Because They Do Not Present a Justiciable Controversy.

"Delaware law requires that a justiciable controversy exist before a court can adjudicate properly a dispute brought before it." *Crescent/Mach I P'rs, L.P. v. Dr*

---

[16] At oral argument, Plaintiffs seemed to argue that the mere existence of the Amendment caused harm with respect to the offer to participate in the 2020 Member Loans. This argument appeared to rest on the proposition that a member considering whether to participate in the 2020 Member Loans needed to know whether there was a potential issuance of a security with a higher priority than the 2020 Member Loans in the event of a liquidating transaction. Oral Arg. Tr. at 58–60. This argument fails, however, because the 2020 Member Loans had priority over all other loans and equity. Am. Compl. ¶ 87.

*Pepper Bottling Co. of Tex.*, 962 A.2d 205, 208 (Del. 2008) (internal quotation marks omitted). Delaware "law requires that a dispute not be moot and that it be ripe for adjudication to avoid wasting judicial resources on academic disputes." *Id.* If a claim is moot or not ripe, the Court cannot assert subject matter jurisdiction over it. *See Stroud v. Milliken Enter., Inc.*, 552 A.2d 476, 480 (Del. 1989) (holding that the Delaware courts may not address moot cases); *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006) ("Ripeness, the simple question of whether a suit has been brought at the correct time, goes to the very heart of whether a court has subject matter jurisdiction.").

"A ripe dispute arises where litigation 'sooner or later appears to be unavoidable' and where 'the material facts are static.'" *Julian v. Julian,* 2009 WL 2937121, at *3 (Del. Ch. Sept. 9, 2009) (quoting *Stroud*, 552 A.2d at 481). That is, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States,* 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide*, 473 U.S. 568, 580–81 (1985)). "In deciding whether a claim is ripe for decision, Delaware courts additionally look at 'whether the interests of those who seek relief outweigh the interests of the court and of justice in postponing review until the question arises in some more concrete and final form.'" *Julian,* 2009 WL 2937121, at *3 (quoting *Bebchuk,* 902 A.2d at 740). Accordingly, absent some "compelling reason,"

28

Delaware courts will "refrain from issuing a purely advisory opinion on an ill developed record." *Bebchuk,* 902 A.2d at 745.

"Mootness arises when controversy between the parties no longer exists such that a court can no longer grant relief in the matter." *Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959, 963 (Del. 2003). "[A] controversy that has become moot normally will be dismissed." *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997). "Delaware courts do not address 'disagreements that have no significant current impact.'" *Crescent/Mach I*, 962 A.2d at 209 (quoting *Stroud*, 552 A.2d at 480).

To the extent that Plaintiffs contend that they may be harmed if the Class C units are ever issued, their claim is unripe. It is undisputed that no Class C units have been issued, and as explained above, AS Roma GP and the Investor Committee would need to take further action before any Class C units could be issued. Therefore, the claims concerning the Class C units and the Amendment are unripe because additional steps would need to be taken to issue any Class C units in the future. *See In re Allergan, Inc. S'holder Litig.*, 2014 WL 5791350, at *7 (Del. Ch. Nov. 7, 2014) (finding that a claim regarding a "provision as it might apply in a hypothetical situation . . . is a classic example of a request for an advisory opinion that is not ripe, and many never become ripe, for judicial review").

To the extent that Plaintiffs claim damage resulting from the March 23, 2020 proposal and potential issuance of Class C units, that claim is moot for reasons that

29

are similar to why the allegations fail to state a claim. The transaction was abandoned, Defendants have not issued Class C units, and the holders of the Existing Loans cannot unilaterally convert their debt into Class C units. *See, e.g., Belanger v. Fab Indus., Inc.*, 2004 WL 3030517, at *1 (Del. Ch. Dec. 29, 2004) (noting that "the defendants abandon[ed] their transaction and thereby moot[ed] the plaintiff's claims"). Furthermore, the TFG transaction has mooted Plaintiffs' claim that the continued existence of the Amendment causes them harm. Having sold its ownership stake in AS Roma to TFG, the Company began the process of winding up. Even if the Amended Complaint had stated a claim at the time of filing pertaining to the Amendment, which I conclude it did not, the TFG transaction mooted the claim. A decision on the Amendment's implications would, thus, have no significant practical effect on the parties. Plaintiffs' claim for breach of the LLC Agreement and breach of fiduciary duty with regard to the Amendment and the abandoned Preferred Equity Offering and Recapitalization are dismissed as moot.

### C. The Amended Complaint Does Not State a Claim for Aiding and Abetting.

Plaintiffs allege in Count IV that the Lender Defendants and Raptor aided and abetted AS Roma GP's breaches of fiduciary duties in approving the Amendment and failing to disclose to Plaintiffs material information relating to the 2020 Member Loans. Am. Compl. ¶¶ 140–41. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship,

30

(2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citations, internal quotations, and alterations omitted); *accord Stone & Paper Inv'rs, LLC v. Blanch*, 2020 WL 3496694, at *13 (Del. Ch. June 29, 2020).

It is axiomatic that to state a claim for aiding and abetting a breach of fiduciary, a plaintiff must allege an underlying breach of fiduciary duty. *See*, *e.g.*, *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1039 (Del. Ch. 2004) ("[H]aving failed to state an underlying claim for breach of fiduciary duty against Morgan Stanley itself, Weil's aiding and abetting claim against HarrisDirect necessarily fails."), *aff'd*, 894 A.2d 407 (Del. 2005); *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *18 (Del. Ch. Jan. 29, 2016) ("[A]n aiding and abetting claim is predicated on an underlying breach of fiduciary duties. Here, because I find that [the breach of fiduciary duty claim] fails to adequately allege a breach of duty, I must also dismiss [the aiding and abetting claim] for failure to state a claim."). As explained above, Plaintiffs have not stated a claim for breach of fiduciary duty. Accordingly, Count IV is dismissed for failure to state a claim.

### D.    The Amended Complaint Does Not State a Claim for Unjust Enrichment.

Count V alleges that Pallotta, D'Amore, and the Ruane Trust were "unjustly enriched by the rights granted to them in the Amendment." Am. Compl. ¶ 148.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999). To state a claim for unjust enrichment, Plaintiffs must allege: (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law. *Id.*

As explained above, the Recapitalization was abandoned, the Amendment did not give the holders of Existing Loans the automatic right to convert their debt into Class C units, and no Class C units were ever issued. Therefore, there was no enrichment inuring to the benefit of Pallotta, D'Amore, and the Ruane Trust through the Amendment and no corresponding detriment to the Company or Plaintiffs. Accordingly, Count V does not state an unjust enrichment claim.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is hereby GRANTED.

**IT IS SO ORDERED**.